IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| PHP Agency, Inc., a Delaware Corporation,<br><br>Plaintiff,<br>vs.<br><br>Jose Martinez aka Tony Martinez, an individual, and Maria Elizarraga aka Puebly Elizarraga, an individual,<br><br>Defendants. | Civil No.<br>Judge:<br>Magistrate Judge:<br><br><br><br><br><br><br><br>REQUEST FOR JURY TRIAL |

# COMPLAINT

Plaintiff PHP Agency, Inc. ("PHP"), a Delaware corporation, alleges as follows:

# PARTIES

1. Plaintiff PHP Agency, Inc. ("PHP") is a Delaware corporation with its principal place of business located at 16650 Westgrove Drive, Suite 500, Addison, Texas 75001.

2. Defendant Jose Martinez aka "Tony" Martinez ("Martinez") is an individual residing in the state of Florida. His address is 7070 Venice Way # 2905, Naples, Collier County, FL 34119.

1

**COMPLAINT**

3.      Defendant Maria Elizarraga aka "Puebly" Elizarraga ("Elizarraga") is an individual residing in the state of Florida. Her address is 464 Jordan Stuart Circle, # 126 Apopka, FL 32703 (Martinez and Elizarraga are collectively referred to as the "Defendants").

## JURISDICTION

4.      This Court has subject matter jurisdiction under the Federal Defense of Trade Secret Act (18 U.S.C. §1832) pursuant to federal question jurisdiction under 28 U.S.C. §1331.

5.      This Court also has subject matter jurisdiction under 28 U.S.C. §1332, as there is complete diversity in this action and the amount in controversy exceeds $75,000. Specifically, both PHP and all its members are domiciled in a state that is different from the states each of the named Defendants are domiciled.

6.      This Court also has personal jurisdiction over the named Defendants, in that each of them were subject to a New Associate Agreement that contained a choice of forum provision requiring them to submit to the "jurisdiction and venue in Dallas County, Texas for disputes that may arise" under the contract.

## STATEMENT OF FACTS

7.      PHP is in the busines of selling life insurance. PHP uses a structured "Field Marketing Organization" ("FMO") model that is well-established within the life insurance industry to distribute and sell its insurance policies.

8.      FMO companies such as PHP market and distribute their products or services through independent distributors. Other well-known FMOs that sell insurance are Transamerica's World Financial Group, New York Life, and Primerica.

9.      In the PHPs FMO business, the independent distributors are called "Associates." An Associate can earn commission on his/her own sales of insurance as well as the sale of

insurance of those Associates aligned in multiple levels beneath him/her. The line of people aligned below a particular Associate is known as the Associate's "downline" or "downline organization." The downline typically works in a physical office that is owned or leased by a well-established Associate (a "Principal") who is effectively building up their own local business in the form of that particular office.  From these field offices, the Principal and their downline team serve customers (consumers who purchase life insurance) in their geographic area.

10. The base of distributors is the lifeblood of any FMO, and it is no different with PHP. Development of the distributor base, including the network of field offices, takes a significant amount of time and investment of hundreds of thousands, if not millions of dollars.

11. PHP maintains a database of its Associates. The database consists of the list of Associates, their rank, their contact information, their payments history, their order history, their pricing history, their consumer customer contact information, their bonus history, as well as other information. The database is a prime asset of PHP and is kept on PHP's computerized servers with restricted access. Access to this database can only be achieved through a password. In other words, the list of Associates (which includes their contact information) is akin to a customer list and is maintained in confidence.

12. To successfully grow its business, PHP permits its Associates limited access to the database based on their level of authority. PHP takes extensive measures to maintain the secrecy of its database. Not only is access to the computerized database strictly controlled, but any Associate must agree to PHP's New Associate Agreement (the "NAA"), which prohibits Associates from using PHP's proprietary information for any purpose other than promoting his/her PHP business.

**COMPLAINT**

13. In addition, to protect the investment in, and economic value of PHP's database of Associates, PHP mandates that all Associates agree not to solicit or recruit other Associates to a competing company for a duration of two (2) years after resigning or being terminated from the company.

14. Defendants were all former PHP Associates and agreed to the terms set forth in the NAA. As Associates, Defendants were provided access to electronic software known as a "back-office," wherein they could see portions of PHP's database to monitor their distributorship business and manage those Associates that were recruited to and placed within their respective downlines.

15. As mentioned above, access to the back-office software system was password protected and was intended only to be used for purposes of promoting PHP and managing PHP business.

16. Also, the back-office afforded each Associate the opportunity to view the list of other Associates in their respective downlines, including their rank, their contact information, their payments history, their order history, their pricing history, their customer contact information, their bonus history, as well as other information.

17. By signing the NAA, Defendants understood that all the data contained in their back-office was proprietary to PHP.

18. Defendants worked with PHP for many years. As a result, Defendants were able to grow massive downlines and acquire years' worth of contact and pricing information of other Associates in their respective downlines.

19. Defendants would review this information daily so they could successfully manage their distributorships during the course of their relationship with PHP.

**COMPLAINT**

20. Eventually, Defendants were terminated from PHP in the form of individual requests to resign. The termination dates for each Defendant are listed as follows:

    a. Martinez: Terminated on 1/8/21

    b. Elizarraga: Terminated on 1/15/21

21. After being terminated, Defendants decided to begin working for a different FMO named Family First Life ("FFL"). Similar to PHP, FFL also sold life insurance.

22. On information and belief, prior to enrolling as distributors for FFL, Defendants met with FFL's officers. FFL's management and representatives offered Defendants a "bridge" agreement that guaranteed certain bonuses and/or commission levels if Defendants were successful in building their business by bringing in distributors from their former company, PHP. Defendants accepted these offers.

23. Defendants did not waste any time in raiding their former PHP downlines. For instance, Defendants had rolodexes of Associates in PHP and used that contact information to begin soliciting them. In fact, Defendants would send out emails, text messages, and other forms of communications to set up private meetings with groups of Associates and pitch them on joining FFL. To make matters worse, Defendants would convince Associates to resign from PHP and join FFL by claiming that PHP was not making any money and was on the brink of going out of business. Further and alarmingly, because Defendants knew what they were doing was unlawful, Defendants claimed to have received assurances that if they were sued by PHP, FFL executives would directly provide attorneys or indirectly provide counsel by "covering the personal out-of pocket cost" of their defense.

24. Moreover, to convince Associates that FFL was a better option, Defendants would refer to bonus and pricing information that was only made available to them in their respective

5

**COMPLAINT**

back-offices at PHP and compare that with the current proposal of FFL. Defendants would brazenly use this information to claim that, by joining FFL, Associates would make more money.

25. Because of Defendants' misappropriation of PHP's trade secrets and interference, many Associates have terminated their relationship with the company. Unless Defendants are enjoined from their conduct, more Associates will continue to resign, and PHP will suffer irreparable harm. Therefore, PHP files suit to both seek a permanent injunction and damages against Defendants.

## CLAIM 1

## BREACH OF WRITTEN CONTRACT (NON-SOLICITATION)

**(By PHP against all Defendants)**

26. PHP incorporates all preceding paragraphs as though fully set forth here.

27. Defendants and PHP entered into a written contract called the NAA.

28. According to the terms of the NAA, an Associate "shall not recruit away, induce or attempt to induce PHP Associates to depart PHP, to sell, or solicit products and services which are competitive with PHP for a period of twenty-four (24) months."

29. PHP has performed all obligations required of it under the terms of the NAA.

30. Defendants breached the non-solicitation provision by inducing and soliciting Associates into a competing FMO named FFL.

31. Defendants were not excused from complying with the non-solicitation provision.

32. As a result of Defendants' breach, PHP has been damaged in an amount that continues to escalate and is to be proven at trial.

6

**COMPLAINT**

## CLAIM 2

## VIOLATION OF THE DEFENSE OF TRADE SECRET ACT

### (By PHP against all Defendants)

33. PHP incorporates all preceding paragraphs as though fully set forth here.

34. PHP owns a database containing valuable information including the identities and contact information of all its Associates and customers. This computer database has substantial economic value. FMO's refer to this database as their "genealogy."

35. A FMO's genealogy is its lifeblood because it would have no way to sell its products or services to customers without its sales force of independent distributors.

36. Other FMOs are constantly competing with PHP for the services of these independent distributors and for its customers. Accordingly, PHP takes great precaution to guard the identities of these people.

37. Such precautions include having each Associate agree that the information is confidential and proprietary to the company. Moreover, the information is contained on a password protected software.

38. Defendants improperly used and disclosed PHP's database to solicit Associates to quit PHP and join FFL.

39. Defendants knew or had reason to know they acquired PHP's trade secrets by improper means.

40. PHP's genealogy database was a trade secret at the time it was misappropriated by Defendants.

41. Defendants used PHP's trade secrets without its express or implied consent to unfairly compete against PHP.

7

**COMPLAINT**

42. Defendants were unjustly enriched as a result of using PHP's database.

43. Defendants use and disclosure of PHP's genealogy was a substantial factor in causing their unjust enrichment.

44. As a direct and proximate result of Defendants' use of PHP's database, PHP has suffered damages in an amount that continues to escalate and is to be proven at trial.

## CLAIM 3

## TORTIOUS INTERFERENCE WITH CONTRACT

### (By PHP against all Defendants)

45. PHP incorporates all preceding paragraphs as though fully set forth here.

46. PHP has valid, written contracts with each of its Associates. The contract is called the NAA.

47. Defendants have knowledge of these contracts, given that they, themselves, were former Associates.

48. Defendants willfully and intentionally interfered with these contracts by contacting Associates and setting up meetings to defame PHP. Specifically, Defendants would inform Associates that PHP had no money and was going out of business.

49. As a result of Defendants' defamation and misappropriation of PHP's trade secrets, Associates have terminated their relationships with PHP, thus, causing economic loss to the company.

50. Defendants' harmful conduct has caused PHP to suffer damages in an amount to be proven at trial.

51. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of PHP. Therefore, in addition to PHP's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 4

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (By PHP against all Defendants)

52. PHP incorporates all preceding paragraphs as though fully set forth here.

53. PHP had a reasonable probability that it would have ongoing business relations with its Associates.

54. Defendants committed independently tortious acts to interfere with these relations. Specifically, Defendants defamed PHP to convince Associates to leave PHP and join FFL.

55. As a result of Defendants' conduct, Associates have resigned from PHP to join FFL. The leaving of these Associates has caused economic harm to PHP in an amount that continues to escalate and is to be proven at trial.

56. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of PHP. Therefore, in addition to PHP's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 5

## DEFAMATION

### (By PHP against all Defendants)

57. PHP incorporates all preceding paragraphs as though fully set forth here.

58. Defendants have publicized false statements of fact to Associates. Specifically, Defendants have informed Associates that PHP has no money and was going out of business.

59. The false statements concerned PHP.

60. Defendants either knew or should have known that the statements were false.

61. As a result of Defendants' false statements, Associates have resigned from PHP, thereby causing economic harm to PHP.

62. Defendants' actions were premeditated and were done with oppression, malice, and a complete disregard for the rights of PHP. Therefore, in addition to PHP's other damages, the Defendants are liable for punitive and exemplary damages.

## CLAIM 6

## VIOLATION OF THE UNIFORM TRADE SECRET ACT

**(By PHP against all Defendants)**

63. PHP incorporates all preceding paragraphs as though fully set froth here.

64. As stated above, PHP had a trade secret, which included proprietary information contained within its database.

65. Defendants were afforded access to PHP's database solely for the purpose of promoting their PHP distributorship.

66. Defendants breached this confidential relationship by using the database to solicit and recruit Associates into a competing FMO named FFL.

67. As a result of Defendants actions, PHP has been damaged in an amount that continues to escalate and is to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, PHP requests judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount to be proven at trial;

2. For punitive damages;

3. For temporary and permanent injunctive relief;

4. For an award of attorney's fees;

5. For costs of suit herein incurred; and

6. For such other and further relief as the court may deem just and proper.

**REQUEST FOR JURY TRIAL**

PHP hereby requests a trial by jury of all issues so triable in this action.

Respectfully Submitted this 25th day of February 2021

s/Chris Wellman
Scott W. Wellman, SBN 82897
Chris Wellman, SBN: 304700
Wellman and Warren, LLP
24411 Ridge Route, Suite 200
Tel: (949) 580-3737

Fax: (949) 580-3738
swellman@w-wlaw.com
cwellman@w-wlaw.com

*Attorneys for Plaintiff PHP Agency LLC*

s/Kristin A. Regel
Kristin A. Regel, Texas Bar No. 24000221
Regel, PLLC
2001 Ross Ave., Suite 700-137
Dallas, Texas 75201
Tel: (214) 210-4322

Fax: (214) 594-8129
kregel@regellaw.com

*Co-Counsel for Plaintiff PHP Agency, LLC*

11

**COMPLAINT**